# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **PEER COMMUNICATIONS CORPORATION** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CASE NO.  6:06CV370** |
| | § | **PATENT CASE** |
| **SKYPE TECHNOLOGIES SA, SKYPE, INC.,** | § | |
| **and EBAY, INC.** | § | |
| | § | |
| **Defendants** | § | |

## MEMORANDUM OPINION

This claim construction opinion construes the terms in U.S. Patent Nos. 6,519,625 (the "'625 patent) and 6,961,748 (the "'748 patent").

## BACKGROUND

The patents in issue are directed at a peer-to-peer communications network, which allows the user of one peer device to access and use resources located on other peer devices. The invention's objective is to provide direct communication links between the peer devices thereby removing the need for an intermediary device to relay communications between the peers. The '748 patent is a continuation in part of the '625 patent. Peer Communications Corporation ("Peer") alleges that Skype Technologies SA, Skype, Inc., and eBay, Inc. (collectively "Skype") infringe on multiple claims of the '625 and '748 patents.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

1

(Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope.   *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   This intrinsic evidence includes the claims themselves, the specification, and the prosecution history.   *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.   Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.   *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.   *Phillips*, 415 F.3d at 1314.   First, a term's context in the asserted claim can be very instructive.   *Id*.   Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.   *Id*.   Differences among the claim terms can also assist in understanding a term's meaning.   *Id*.   For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.   *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"   *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).   "[T]he specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"   *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).   This is true because a patentee may define his own terms, give

2

a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and

its prosecution history in determining how to read claim terms." *Id*.

## ANALYSIS

### *Communications network*

The Court agrees with Peer's proposal that this term needs no construction. The patents' usage of this term is very broad, generally referring merely to a network used for communicating.

Skype argues that the term requires definition and proposes that a "communications network" be construed as "a collection of interconnected devices of a defined group of users that communicate with each other using data packets." By its proposal, Skype seeks to limit the term "communications network" to a specific disclosed embodiment generally called a "personal network." In particular, Skype seeks to impose two unsupported limitations derived from that specific embodiment: (i) confining the communications network to a "defined group of users" and (ii) mandating that the peer devices in the network communicate exclusively by "using data packets."

With respect to its proposal of a "defined group of users," Skype contends that the communication network is not "an amorphous collection of users" because users are required to log into a registry in order to join the network. However, Skype is confusing a "communication network" with a "personal network" disclosed in an embodiment. The registry to which Skype refers is used to list and coordinate "personal network" resources. '625 patent, Col. 3:9–12; '748 patent, Col. 3:11–15. The specification teaches "a [personal network] virtual network can coordinate network access devices **linked by** a communications network." '625 patent, Col. 3:7–9; '748 patent, Col. 3:9–11 (emphasis added). Thus, while a "personal network" uses a "communications network," there is nothing in either specification that confines a "communications network" to being used exclusively as a "personal network" or anything similar.

4

To the contrary, the specifications use the term "communication network" in a very broad context that is not limited as Skype suggests. For example, both patents analogize "communications networks" to the Internet, stating that "[c]ommunications networks, including the Internet, have been used to access resources located on various network access devices." '625 patent, Col. 1:12–13; '748 patent, Col. 1:14–16. In addition, the patents each use the term "communications network" to describe the cloud diagram shown as item 200 of Figure 2, which illustrates a generic network. *See* '625 patent, Fig. 2; '748 patent, Fig. 2. Similarly, each of the claims use the term "communications network" in the broad context of a generic network in which the particulars of the claim are placed. '625 patent, claims 1 and 3; '748 patent, claims 1, 16, and 19.

Skype also contends that the communications network is limited to "packet based communications." However, the specification teaches that "[n]etwork communication can be accomplished over a medium such as public switched telephone network dial-up connections and packet network interconnections." '625 patent, Col. 4:39–42; '748 patent, Col. 4:46–49. The specification also lists different types of network access devices that communicate over analog communication networks such as those using the cellular and telephone networks. *Id*. Thus, the specification does not limit the "communications network" to "packet based communications."

The term "communications network" is clearly used in its broadest sense and is intended to encompass all types of networks.[1] The term "communication network" is simple enough for a lay jury to understand. *See Philips*, 415 F.3d at 1314. Furthermore, since Skype's limiting proposals bear no inherent relationship to the term "communications network, no construction is necessary to

---

[1] However, Peer concedes that the invention does not cover purely analog networks; rather, the analog network must work in concert with a digital network.

5

clarify a meaning for the jury.  Accordingly, the Court declines to construe this term

*Network access device*

The Court construes this term as "any device that provides communication on an electronic communications network."

Skype proposed construction is "a device that sends and receives data packets over a packet data network such as the internet."  As discussed above with "communications network," Skype is improperly limiting the term to communication via "data packets over a packet data network."  The specification contradicts such a limitation, for example, by stating that the devices can use telephone and cellular networks.  '625 patent, Col. 4:39–42; '748 patent, Col. 4:46–49.  The specification also teaches that a "cellular communication device"—which the parties agree can communicate over purely analog networks—is one type of network access device.  '625 patent, Col. 4:31–33; '748 patent, Col. 4:38–40.

Skype's proposal also requires that the devices function to send and receive.  However, the specification teaches that network access devices are not required to send and receive, rather "a network access device . . . may be a receive only device."  '625 patent, Col. 9:15–16; '748 patent, Col. 9:35–36.  Thus, Skype's proposed construction is over-limiting.

While generally describing "network access devices," the specification teaches that a network access device can include "cellular communications devices, interactive WEB devices, portable handheld devices or any device that provides communication on an electronic communication network."  '625 patent, Col. 4:31–35; '748 patent, Col. 4:38–42.  The disjunctive provides an accurate and complete construction for "network access device"—"any device that provides communication on an electronic network."  *See Philips*, 415 F.3d at 1314–15 ("Usually, [the

6

specification] is dispositive; it is the single best guide to the meaning of a disputed term.")

Accordingly, the Court construes "network access device" as "any device that provides

communication on an electronic network."[2]

*Display*

  The Court adopts Peer's proposal that "display" maintains its plain and ordinary meaning and

does not require construction.

  Skype's proposed construction is "to make visible on a screen."  Skype's construction

imports a hardware limitation not found in the intrinsic evidence.  In its brief, Skype claims that the

specification requires the registry to be displayed on "a screen or other display device."  Docket No.

70 at 29.  However, Skype does not explain why it limits its construction to a "screen."  While the

word "display" does imply that a mechanism may be needed to "display" the information, the

intrinsic evidence does not identify a specific mechanism for "displaying."  *E.g., compare* '625

patent, Fig. 2; '748 patent, Fig. 2 (showing various types of hardware screens) *with* '625 patent,  Col.

2: 43–44; '748 patent, Col. 2 44–45 (stating that the software can display a registry without denoting

the specific type of display mechanism).  Thus, it is improper to read such a limitation into the claim

language.  *See Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364 (Fed. Cir. 2003)

("Though understanding the claim language may be aided by the explanations contained in the

written description, it is important not to import into a claim limitations that are not a part of the

claim.").

  The term "display" is so simple that a lay juror would have no difficulty in understanding

it.  *See Philips*, 415 F.3d at 1314.  It is difficult to conceive of a more clear way to convey the

---

[2] At the *Markman* hearing, Peer agreed to this construction.  *Markman* Hr'g Tr. at 89, ll. 2–5.

meaning of this term.  Accordingly, the Court does not construe the term "display."

*Registry*

The Court construes "registry" as "an item manipulated by software that both lists and coordinates resources available on the network."

Skype proposes "an electronic address book that tracks the current personal network address for each resource available to network access devices that are logged in, and responds to queries for such addresses from those network access devices."  Skype contends that the patentee specifically defined "registry" in the Provisional Application; thus, the patentee's lexicography should control.[3]

The Provisional Application includes a section titled, "definition of a registry."  Skype's Response, Exh. D at 5.  The Provisional states that "[a] registry is an application that tracks the current addresses of a group of users.  A registry is a very simple application, whose sole purpose is to react to incoming (Internet delivered) messages, of which there are four types: Login . . .Logout . . .Ping. . . [and] Query . . . ."  *Id*.

Notwithstanding this section of the Provisional, one skilled in the art would not conclude that the Provisional definition is intended to fully define the term "registry" as used in the claims. Foremost, this is because the Provisional's definition of "registry" is clearly labeled in the Provisional as a "Description of a Preferred Embodiment."  *Id*. at. 3.  Furthermore, the relevant portion of the Provisional reads exactly like a description of an implementation or embodiment. Moreover, this definition of "registry" is too narrow to apply to the many uses of the term throughout the issued patents and claims.  For example, the issued patents and claims repetitively refer to

---

[3]  As the Provisional Application was incorporated by reference, Skype correctly asserts that the Provisional Application is an express part of each patent.

"displaying the registry," or "listing on" the registry, or "publishing" the registry.  '625 patent, Cols. 2:43-45, 6:23-27, 6:45-46, claims 1 and 2; '748 patent, Cols. 2:44-48, 6:31-33,  6:35-36, 6:54-55, claims 16 and 19.  In addition, both patents describe the table-like diagram of figure 5 as a "registry." These referenced uses of the term "registry" lack any clear and reasonable meaning if the Provisional definition is applied.

Ultimately, the Provisional refers to a registry as a "very simple application." Skype's Response, Exh. D at 5.  Alternatively, the published patents and claims use the term "registry" more generically to describe something that lists and coordinates resources—functions that the Provisional's preferred embodiment ("simple application") may certainly do in addition to the other functions and characteristics described for that embodiment.  Thus, the Provisional's definition of "registry" applies to the preferred embodiment described in the Provisional so the patentee's lexicography does not control.  *E-Pass Tech., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003).

Peer originally proposed "registry" be construed as "a list."  At the *Markman* hearing, Peer further proposed "registry" be construed as "an electronic list."  However, Peer's construction is too broad.  If the patentee had intended a registry to be a "generic list," the patentee could have used that word.  Instead, the patentee used "registry," which as discussed below, is something more than an "electronic list."

The specification teaches that the registry not only "lists" but also "coordinates" the available resources.  '625 patent, Col. 4:53–55.  Furthermore, the claim language makes clear that the executable software operates to display and update the registry.  *Id.*, Cols. 9:31–35, 9:59–10:4. Claim 14 also states that a registry is formed on a network access device and that the registry

9

receives addresses for each available resource. *Id*. Col. 10:40–43. Thus, a registry must be defined to allow for a dynamic, not static, item that is manipulated by the executable software to ensure the registry's accuracy. The '625 and '748 patents' specifications offer a defining description of the registry that applies to all uses in the claims and specifications. In particular, in an overview description of Figure 2, both patents state that a "registry 262 can reside on any network access device 211-219 **to list and coordinate the resources available on the network**." '625 patent, Col. 4:53–55; '748 patent, Col. 4:60–62 (emphasis added).

Accordingly, the Court construes "registry" as "an item manipulated by software that both lists and coordinates resources available on the network."

*Resource*

The Court construes "resource" as "something that can be used for help or support."

Skype's proposed construction is "a shared application available to access by other network access devices." While an application or a shared application is one example of a resource from the specifications, the patents and claims clearly intend a much broader meaning, which is exemplified by several suggested embodiments. For example, Figure 1 of each patent is a detailed illustration of computer hardware that "depicts physical resources of a computer 100." '625 patent, Col. 3:31; '748 patent, Col. 3:36. In addition, both specifications state that "[h]uman agents, robotic agents, and other resources utilizing a PeN registry 262 can be identified by multiple identification data." '625 patent, Col. 6:10–11; '748 patent, Col. 6:18–20. Moreover, the patents state that "the registry 262 may list other resources 507, such as a database or file library." '625 patent, Col. 6:29–31; '748 patent, Col. 6:37–39. Finally, even the claims recite sample resources beyond the scope of Skype's proposal. For example, the '625 patent's dependent claim 11 recites "wherein the resource is

10

selected from the group including a database query, mail message and a file transfer request." '625

patent, Col. 10:25–26.  Since none of these exemplary resources would necessarily be understood

by one of skill to be "shared applications," Skype's proposed construction is over limiting.  This

result is bolstered by the doctrine of claim differentiation as the '625 patent's dependent claim 10

adds the limitation of  "an application" to independent claim1.  *See Phillips*, 415 F.3d at 1314–15.

> Peer proposes "resource" means
>
> anything that does or provides work on the network, including without limitation a
> service (such as a database query, file transfer request, or a chat or mail message), an
> application program (such as a word processor, database, spreadsheet, or
> internet/network access software), hardware (such as a printer, fax machine, copier,
> storage device), etc.

Peer's construction is also over-limiting.  Dependent claim 6 recites that a network access device

may specify the extent to which it will make its resources available to the network.  '625 patent, Col.

10:6–10; 5:10–12 ("Each network access device 211-219 can specify the extent to which it will make

its resources available").  While a resource may provide or do work on the network, a resource is not

defined by its ability to do work as a network device may designate a resource to provide no work

on the network.

Furthermore, while most of Peer's examples find support in the specification, Peer's

enumerated examples could potentially confuse the jurors.  The presence or absence of certain

examples, such as a fax machine or printer, may influence the infringement question regardless of

whether the item is serving as a resource or not.  Thus, the examples are improper as they present

a risk of confusion or prejudice without any clear benefit to defining or clarifying the term.

The '625 patent uses the term "resource" in its broadest sense.  As discussed above, several

dependent claims recite specific types of resources.  The specification further broadens "resource"

with examples such as humans or robotic agents.  '625 patent, Col. 6:10 ("Human agents, robotic agents, and other resources").  As the intrinsic evidence does not provide a special meaning for "resource," its plain and ordinary meaning applies.  *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998).  Accordingly, the Court construes "resource" as "something that can be used for help or support."  *See* The American Heritage Dictionary of the English Language (4th Ed. 2000).

*Personal network address*

The Court construes "personal network address" as "an address that identifies the location of a resource."[4]

Skype's proposed construction is "a network protocol address and a port number of a resource combined into a single entity."  Skype contends that its proposed construction is derived directly from the specification.  For support, Skype quotes the following from the '625 patent specification:

> a PeN address can include a destination address 310 concatenated with an application program identifier 320. The destination address can be a network address such as an IP address specifying a network access device 211-219 on which a resource is being made available. The application program identifier 320 can be a port number associated with an application program administering the resource.

'625 patent, Col. 5:38–45; '748 patent, Col. 5:45–52.  While this supports Skype's proposed construction, the quote must be read in its full and appropriate context, which is as follows:

> ***A PeN address identifies the location at which a resource can be located. In one embodiment, as illustrated in FIG. 3,*** a PeN address can include a destination address 310 concatenated with an application program identifier 320. The destination address 310 can be a network address such as an IP address specifying a network

---

[4] The Court proposed this construction at the *Markman* hearing, and Peer agreed with the construction. *Markman* Hr'g Tr. at 101, ll. 14–21.

12

> access device 211-219 on which a resource is being made available. The application
> program identifier 320 can be a port number associated with an application program
> administering the resource.

'625 patent, Col. 5:35–45; '748 patent, Col. 5:43–52 (emphasis added).  When read in context, the

specification expressly conditions Skype's construction as relating to one embodiment.  For this

particular embodiment, the specification teaches "the application program identifier 320 can be a

port number," but it does not require the identifier to be a port number. '625 patent, Col. 5:43–45;

'748 patent, Col. 5:50–52.  Skype's attempt to import limitations from a preferred embodiment is

improper.  *See Phillips*, 415 F.3d at 1323.

> The dependent claims also suggest that Skype's construction is too narrow. *See Phillips*, 415

F.3d 1314–15 ("Differences among claims can also be a useful guide in understanding the meaning

of particular claim terms.").  In particular, several claims list the components of a personal network

address. *See, e.g.,* '625 patent, Col. 9:35–38 ( "wherein the personal network address comprises an

internet protocol address portion and a port number portion").  However, not all claims denote

specific requirements. *See, e.g.,* '625 patent, Col. 10:35–47 (stating "a personal network address"

without listing specific components).  Thus, the doctrine of claim differentiation further counsels

against Skype's proposed construction, which limits the address to including a "port number."

> As discussed above, the specification does not require nor suggest that the "personal network

address" is limited to a specific list of components; however, it does require that the address identify

the location of a resource.  The specification teaches that " a [personal network address] identifies

the location at which a resource can be located."  '625 patent, Col. 5:36–38; '748 patent, Col.

5:43–45.  This is broad enough to encompass the usage of the term in both the independent and

dependent claims of the '625 and '748 patents.  Accordingly, the Court construes the term as "an

address that identifies the location of a resource."

*Direct communications link*

The Court construes "direct communications link" as "a path between two endpoints that does not use an intermediary device to obtain an endpoint's address anywhere along the path."

Peer's proposed construction for the term "direct communications link" is "a communication between at least two network access devices without the use of a central server." In support of this proposal, Peer contends that a key aspect of the invention and its purpose is to eliminate central servers. Peer Opening Brief at 20. The proposed definition remains entirely contingent upon the meaning of the phrase "central server." Since "central server" will have no ready meaning to a jury, Peer's dependence upon this phrase leaves the proposed construction with an insufficient definition. For example, without another definition, the word "central" has a connotation regarding physical positioning, which would be inappropriate and thus confusing in this context. Furthermore, even a close review of the intrinsic record does not cure this problem as the term, "central server" is not used elsewhere in the specification or claim language.

Skype proposes "a communication link that does not use an intermediary." Skype contends that the specification teaches that communications occur without intermediaries or intermediate destinations. Skype admits that their construction does not exclude everything that may lie in the communications path between two network devices. For example, the data may flow through routers, gateways, and other hardware, which Skype admits are not necessarily excluded by Skype's construction. Even with Skype's concessions, the term "intermediary" is just as potentially confusing as "central server." Like Peer's proposal, Skype's construction would require further construction by this Court at least regarding the meaning of "intermediary."

14

The specifications and claims of the patents are directed to providing direct communications between a plurality of network access devices.  The prior art used centralized servers—which maintained the addresses of network participants—acting as communication hubs. '625 patent, Cols. 1:62–2:22; '748 patent, Cols. 1:66–2:25.  Thus, in the prior art, a network access device only needed the address of the central server.  Devices would then address communications to the server, and the server would forward the communication to the desired endpoint.  *Id*.

The specification teaches that an address allows devices to communicate directly across a network.  '625 patent, Col. 1:60–61; '748 patent, Col. 1:62–63.  To facilitate the direct communication, the specification teaches that network access devices can use a registry to locate addresses of other devices or resources on the network.  *See* "Registry" *supra*.  Devices use the registry to find addresses and then use the found addresses to communicate directly with other devices; critically, communications such as messages do not flow through the registry. '625 patent, Col. 6:53–54; '748 patent, Col. 6:64–65.  Thus, using a registry removes the need to use an intermediary device to look up addresses and relay messages to the desired endpoint.  However, one embodiment of the '748 patent does allow for an "intermediary application" that receives transmissions from a resource and then forwards the transmissions unmodified to other resources. '748 patent, Col. 10:15–19.  Thus, the claims do not prevent an endpoint from forwarding a message, but only prevent a directly addressed intermediary device from serving as an address-look-up service and message relay service.  Skype's expert acknowledges that "as long as the data is addressed directly to its final destination rather than to an intermediary [device], the communications are direct."  Skype's Response at 23.

Thus, a communication is not direct if the communication is intended for a particular

endpoint device but is addressed to a service that looks up the endpoint's address and forwards the communication to the endpoint device.  The communication is direct if one endpoint addresses a communication directly to another endpoint.  Accordingly, the Court construes the term as "a path between two endpoints that does not use an intermediary device to obtain an endpoint's address anywhere along the path."

*Network access device hosting an available resource*

The Court construes this phrase as "a network access device providing network access to and/or from an available resource."

The Court previously construed "network access device" and "resource" in this opinion. Neither party disputes the meaning of "available,"[5] which leaves "hosting" as the sole disputed term in this phrase.

Peer proposes that the term needs no construction as the term retains its plain and ordinary meaning.  Skype's proposed construction is "a network access device making its own resource available for use by another network access device."

Although courts are not required to construe every term, Skype presents a dispute of claim scope—whether "hosting an available resource" means "making its own resource available"—which this Court must resolve.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, ___ F.3d___, 2008 WL 878924 at *9 (Fed. Cir. April 03, 2008) ("when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").

Skype offers no evidence to support their construction, which equates the claim language

---

[5] Peer states the term has its plain and ordinary meaning, and Skype impliedly agrees as it uses the term "available" in its proposed construction.

of "hosting an available resource" with the concept of "making its own resource available."  One of ordinary skill in the art would not understand "hosting an available resource" to mean that the network access device "makes its own resource available."  The notion of a network access device's "own resource" has no clear meaning in the context of the patent or otherwise.  For example, the question of whether a resource is a device's "own resource" is necessary to decipher Skype's proposal, but both irrelevant and unanswerable in view of the patents.  In addition, the claim language states that a network access device hosts a resource ***that is available***, while Skype's proposal requires that the network access device ***make*** the device available.  Furthermore, the specification contradicts Skype's proposal.  In particular, the specification uses the word "hosting" primarily with respect to the registry, and in one embodiment, it is clear that "multiple network access devices . . . [may] host a registry [] concurrently."  '625 patent, Col. 6:50–52; '748 patent, Col.6:61–63.  Thus, while the registry is hosted, it has no clear expressed or implied owner.

The claim language uses "hosting" in the same sense as the specification.  "Hosting" does not denote ownership.  As with "registry," one of ordinary skill in the art would understand "hosting available resources" to mean "providing other network users access to available resources."  This would create a bilateral exchange whereby network devices could access available resources and available resources could access network devices.  There is no evidence to support that the network device must "own" the resource.  Accordingly, the Court construes this phrase as "a network access device providing network access to and/or from an available resource."

*Software operative with a network access device*

The parties do not dispute the meaning of this phrase; rather, the sole issue is whether this

phrase is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.[6]

When a claim term does not use the term "means," it will trigger a rebuttable presumption that Section 112, ¶ 6 does not apply. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). This presumption may be overcome if it is demonstrated that "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). However, that presumption "is a strong one that is not readily overcome." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).

Skype contends that the term "software" fails to recite definite structure for performing the recited functions. For this proposition, Skype relies solely on *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003). Skype cites the *Altiris* court's holding that "because 'commands' (i.e. software) is so broad as to give little indication of the particular structure used here and is described only functionally, one must still look to the specification for an adequate understanding of the structure of that software." *Id.*

*Altiris* is distinguishable from the present suit. In *Altiris*, the term at issue—"means of booting"—used the word "means," which triggered the presumption that Section 112, ¶ 6 applied. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375–76 (Fed. Cir. 2003). Here, as the phrase does not use the term "means," there is a presumption that Section 112, ¶ 6 does not apply. *CCS Fitness, Inc.*, 288 F.3d at 1369. Thus, it is Skype's burden to overcome this presumption. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–20 (Fed. Cir. 2004).

---

[6] In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that a means-plus-function limitation "be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (citing 35 U.S.C. § 112, ¶ 6).

The *Altiris* court held that "'commands' represent structure (in the form of software)." *Altiris*, 318 F.3d at 1376. However, the court found that "commands" was insufficient structure to perform the entirety of the claimed function—booting a computer. *Id*. Depending on the claimed functions, "software" may be insufficient structure. *Id*.

Here, Skype does not show how "software" is insufficient to perform the functions recited in the claim. Unlike "booting," which may require non-software structure, the '625 patent's claimed functions are performed in their entirety by software. *See*, *e.g.*, '625 patent, Col. 9:30–42. Accordingly, Skype does not meet its burden to rebut the presumption that 35 U.S.C. § 112, ¶ 6 does not apply. As neither party contends that this term needs construction, the Court declines to construe this phrase.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in Appendix B. The claims with the disputed terms in bold are set forth in Appendix A.

**So ORDERED and SIGNED this 29th day of May, 2008.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

### U.S. Patent No. 6,519,625

1. In a **communications network** comprising a plurality of **network access devices**, an improved network access mechanism enabling the plurality of **network access devices** to communicate directly with each other, the network access mechanism comprising:

   a plurality of **network access devices** accessible via a **communications network**; and executable software stored on each **network access device**, wherein the software is executable on demand, the software operative with a **network access device** to enable the **network access device** to:

   **display** a **registry** of **resources** available on the plurality of **network access devices**;

   associate a **personal network address** with each available **resource**, wherein the **personal network address** comprises an internet protocol address portion and a port number portion; and

   establish a **direct communications link** between one **network access device hosting an available resource** and another **network access device** utilizing the **personal network address**.

2. The improved network access mechanism of claim 1 wherein the executable software is additionally operative to cause a first **network access device** to be active in **displaying** the **registry** of **resources** available on the plurality of **network access devices** and subsequently cause a second **network access device** to be active in **displaying** the **registry** of **resources** available on the plurality of **network access devices**.

3. The improved network access mechanism of claim 1 wherein the executable software is additionally operative to cause a first **network access device** to poll the **communications network** to determine if a particular second **network access device** is available to communicate with.

4. The improved network access mechanism of claim 1 wherein the polling comprises a ping of an internet protocol address portion of a **personal network address**.

5. The improved network access mechanism of claim 1 wherein the executable software is additionally operative to cause the **network access device** to:

   poll each internet protocol address comprising the **personal network addresses** listed in the **registry**;

   certify the accuracy of the **registry** according to the results of the poll.

6. The improved network access mechanism of claim 1 wherein the executable software is additionally operative to cause each **network access device** to specify to the **registry** the extent to which each **network access device** will make **resources** on the **network access device** available and publish the **resources** available.

7. The improved network access mechanism of claim 1 wherein each **personal network address** comprises a temporary internet protocol address.

8. The improved network access mechanism of claim 1 wherein one **personal network address** comprises a permanent internet protocol address and other **personal network addresses** comprise a temporary internet protocol address.

9. The improved network access mechanism of claim 1 wherein the **registry** of **resources** comprises a **resource** identifier.

10. The improved network access mechanism of claim 9 wherein the **resource** comprises an application program and the **resource** identifier comprises a port number.

11. The improved network access mechanism of claim 10 wherein the **resource** is selected from the group including a database query, a mail message and a file transfer request.

20

12. The improved network access mechanism of claim 10 wherein the **registry** comprises a description of an agent operating a **network access device** associated with a **resource**.

13. The improved network access mechanism of claim 1 wherein the executable software is additionally operative to cause a **resource** to link to multiple streams of data.

14. A method for enabling direct communication between each a plurality of **network access devices** and a least one **resource** available on each **network access device**, each resource having a **personal network address**, the method comprising the steps of:

forming a **registry** on one of the plurality of access devices;

receiving into the **registry** a **personal network address** for each **resource** available;

transmitting a **personal network address** of a **resource** available to a requesting **network access device**; and

establishing a **direct communication link** between the requesting **network access device** and the **resource**.

15. The method of claim 14 further comprising the step of polling an internet protocol address portion of each **personal network address** to certify **registry** accuracy.

16. The method of claim 14 further comprising the steps of forming a second **registry** a second of the plurality of **network access devices**, wherein the second **registry** comprises the same **resources** as the **registry** and making the second **registry** available to the **network access devices** if the **registry** becomes unavailable.

17. The method of claim 14 or 16 wherein the **registry** comprises a description of an agent associated with each **network access device**.

### U.S. Patent No. 6,961,748

1. A method, comprising:

**displaying** to a user at a first user **network access device** a **registry** of **resources** available from a plurality of remote user **network access devices** via a **communications network**;

associating at the first user **network access device** a **personal network address** with each available **resource**, wherein the **personal network address** includes a destination address portion and an application program identifier portion;

and establishing a **direct communications link** between a second user **network access device hosting an available resource** and the first user **network access device** using the **personal network address** associated with the **resource**.

3. The method of claim 1, wherein the **resource** is an interface application associated with at least one of a human and an automated process.

4. The method of claim 1, wherein the **resource** is a service application.

7. The method of claim 1, wherein the **resource** comprises a common depository of messages from a plurality of agents.

8. The method of claim 1, wherein the **resource** enables communication between agents at remote **network access devices**.

16. A medium storing instructions adapted to be executed by a processor to perform a method, said method comprising:

**displaying** to a user at a first user **network access device** a **registry** of **resources** available from a plurality of remote user **network access devices** via a **communications network**;

associating at the first user **network access device** a **personal network address** with each available **resource**, wherein the **personal network address** includes a destination address portion and an application program identifier portion; and

21

establishing a **direct communications link** between a second user **network access device hosting an available resource** and the first user **network access device** using the **personal network address** associated with the **resource**.

18. The medium of claim 16, wherein the **resource** is an interface application associated with at least one of a human and an automated process.

19. A method of accessing **resources** available from a plurality of remote user **network access devices** via a **communications network**, comprising:

retrieving at a first user **network access device registry** information from another remote user **network access device** that hosts an active **registry**, the **registry** information including a **personal network address** for each of a plurality of available **resources**, wherein each **personal network address** includes a destination address portion and an application program identifier portion;

**displaying** to a user at the first user **network access device** a **registry** of available **resources**;

receiving from the user an indication of a selected **resource**; and establishing a **direct communications link** between a second user **network access device** associated with the selected **resource** and the first user **network access device** using the **personal network address** associated with the selected **resource**.

20. A method, comprising:

forming at a first user **network access device** a **registry** of resources available in a network of remote user **network access devices**;

associating at the first user **network access device personal network addresses** for **resources** in the **registry**;

receiving at the first user **network access device** a request from a second user **network access device**; and transmitting from the first user **network access device** to the second user **network access device** a set of **personal network addresses** associated with available **resources**, wherein each **personal network address** includes a destination address portion and an application program identifier portion.

21. The method of claim 20, further comprising:

determining that the **registry** at the first user **network access device** is an active **registry**.

22. The method of claim 21, further comprising:

arranging for another **registry** at another user **network access device** to become the active **registry.**

## APPENDIX B

| U.S. Patent Nos. 6,519,625 & 6,961,748 | |
|---|---|
| **Disputed Claim Terms** | **Court's Construction** |
| communications network<br><br>('625 patent, Claims 1and 3)<br>('748 patent, Claims 1, 16, and 19) | no construction |
| network access device<br><br>('625 patent, Claims 1, 2, 3, 5, 6, 12, 14, 16, and 17)<br>('748 patent, Claims 1, 8, 16, 19, 20, 21, and 22) | any device that provides communication on an electronic communications network |
| display<br><br>('625 patent, Claims 1and 2)<br>('748 patent, Claims 1, 16, and 19) | no construction |
| registry<br><br>('625 patent, Claims 1, 2, 5, 6, 9, 12, 14, 15, 16, and 17)<br>('748 patent, Claims 1, 16, 19, 20, 21 and 22) | an item manipulated by software that both lists and coordinates resources available on the network |
| resource<br><br>('625 patent, Claims 1, 2, 6, 9, 10, 11, 12, 13, 14, and 16)<br>('748 patent, Claims 1, 3, 4, 7, 8, 16, 18, 19, and 20) | something that can be used for help or support |
| personal network address<br><br>('625 patent, Claims 1, 4, 5, 7, 8, 14, and 15)<br>('748 patent, Claims 1, 16, 19, and 20) | an address that identifies the location of a resource |
| direct communications link<br><br>('625 patent, Claims 1and 14<br>('748 patent, Claims 1, 16, and 19) | a path between two endpoints that does not use an intermediary device to obtain an endpoint's address anywhere along the path |
| network access device hosting an available resource<br><br>('625 patent, Claim 1)<br>('748 patent, Claims 1 and 16) | a network access device providing network access to and/or from the available resource |
| software operative with a network access device<br><br>('625 patent, Claim 1) | no construction |